EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Consejo de Titulares del Condominio Centro Internacional de Mercadeo Torre II representado por su Junta de Directores<br><br>Peticionario<br><br>v.<br><br>PRCI LOAN CR, LLC<br><br>Recurrido | Certiorari<br><br>2022 TSPR 106<br><br>210 DPR \_\_\_\_ |

Número del Caso: CC-2021-300

Fecha: 15 de agosto de 2022

Tribunal de Apelaciones:

     Panel V

Abogada de la parte peticionaria:

     Lcda. María de Lourdes Rivera Sostre

Abogado de la parte recurrida:

     Lcdo. Francisco Fernández Chiques

Materia: Propiedad Horizontal – La disposición en el reglamento de un condominio que exime del pago de las cuotas de mantenimiento atrasadas al adquirente voluntario de una de sus unidades es nula por contravenir la Ley de Condominios.

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Consejo de Titulares del Condominio Centro Internacional de Mercadeo Torre II representado por su Junta de Directores

  Peticionario

    v.

PRCI LOAN CR, LLC

  Recurrido

CC-2021-0300

La Jueza Presidenta Oronoz Rodríguez emitió la Opinión del Tribunal

En San Juan, Puerto Rico, a 15 de agosto de 2022.

Nos corresponde determinar si es válida una disposición en el reglamento de un condominio que exime del pago de las cuotas de mantenimiento atrasadas a quien adquiere una de sus unidades en ejecución de una garantía hipotecaria o si, por el contrario, prevalecen las disposiciones de la Ley de Condominios, infra, en cuanto a los adquirentes involuntarios y voluntarios. Por entender que conforme a la jerarquía de las fuentes del derecho los reglamentos no pueden ir en contra de lo que dispone una ley especial, se revoca la sentencia recurrida y se devuelve el caso al foro primario para que continúe con los procedimientos de acuerdo con lo aquí resuelto.

I

El 2 de noviembre de 2018 el Consejo de Titulares del Condominio Centro Internacional de Mercadeo Torre II (Consejo de Titulares o peticionario) presentó una demanda sobre cobro de cuotas de mantenimiento contra PRCI Loan CR, LLC (PRCI o recurrido). Alegó que el Condominio Centro Internacional de Mercadeo Torre II (Condominio) se constituyó bajo el régimen de propiedad horizontal el 8 de octubre de 2003, mediante la Escritura Matriz Núm. 44, otorgada ante el Notario Público José Antonio Sadurní Lahens ("Escritura Matriz"). Explicó que el 13 de febrero de 2017 PRCI adquirió la oficina 504 del Condominio mediante venta judicial como parte del trámite realizado en un caso de ejecución de hipoteca (Doral Financial v. Quantum Business Engineering, Inc., Caso Civil Núm. DCD2012-1951).[1] En específico, sostuvo que PRCI es una entidad que se dedica a adquirir carteras de préstamos para luego cobrar su acreencia y que, por ello, se le debía considerar un adquirente voluntario, a tenor con el artículo 41 de la Ley de Condominios, Ley Núm. 104 de 25 de junio de 1958 (Ley Núm. 104-1958) 31 LPRA ant. sec. 1291 et seq. (derogada por la nueva Ley de Condominios, Ley Núm. 129 de 16 de agosto de 2020, 31 LPRA sec. 1921a et seq. (Ley Núm. 129-2020)). En consecuencia, el Consejo de Titulares argumentó que, como

---

[1] La venta judicial se celebró como parte del trámite del caso de ejecución de hipoteca en Doral Financial v. Quantum Business Engineering Inc., DCD2012-1951. El 6 de febrero de 2017 se produjo la sustitución de la demandante en el pleito DCD2012-1951. En consecuencia, el epígrafe cambió a PRCI Loan, LLC v. Quantum Business Engineering, Inc.

adquirente voluntario, PRCI estaba obligado a pagar todas las cuotas de mantenimiento que acumuló la oficina 504.

El 2 de enero de 2019 PRCI contestó la demanda y planteó que era un adquirente involuntario según el artículo 41 de la Ley Núm. 104-1958. Además, argumentó que según el artículo 17 del Reglamento del Condominio, el cual forma parte de la Escritura Matriz, este solo respondía por las cuotas de mantenimiento que se acumularan a partir de la fecha en que adquirió la propiedad.[2]

En el ínterin, y en aras de no entorpecer y paralizar la venta de la oficina 504, las partes estipularon que se permitiría la reconexión a las utilidades para que PRCI pudiera seguir operando en la oficina 504, siempre y cuando se depositaran las sumas acumuladas durante los seis (6)

---

[2] En lo pertinente, el artículo 17 del Reglamento del Condominio, estable lo siguiente:

"---Las sumas adeudadas por gastos de mantenimiento o cualquier otra suma adeudada en virtud de decisiones o acuerdos v[á]lidos logrados por el Consejo de Titulares constituirá, salvo que por Ley se disponga de otro modo, un gravamen preferente sobre toda otra deuda de la unidad salvo por las contribuciones sobre la propiedad y por la primera hipoteca constituida al adquirirse la misma y siempre que dicha hipoteca haya sido registrada o presentada para registro con anterioridad al surgimiento y anotación registral de dicha deuda.-------------------------------

---Todo titular que adquiera su título como resultado de la ejecución de un crédito hipotecario que grave una unidad del Condominio, incluyendo un acreedor hipotecario, no será responsable de los cargos adeudados por concepto de mantenimiento adeudados y/o derramas debidamente aprobadas por el Consejo de Titulares, que hayan sido devengados con anterioridad a la fecha de la adquisición del título por tal adquiriente, entendiéndose, sin embargo, que lo anterior no deberá interpretarse en tal forma que impida el que el Consejo de Titulares y/o la Junta de Directores radique acciones reclamando el cobro de tales cargos, impuestos o gastos de mantenimiento contra las personas que corresponda y los haga válidos en cualquier forma prevista por Ley.---"

meses previo a la adjudicación en subasta. En esta estipulación, ninguna de las partes renunció al cobro de las sumas en disputa. Ese asunto siguió pendiente ante el foro judicial.

Así las cosas, el 8 julio de 2019 el Consejo de Titulares presentó ante el foro primario una solicitud de sentencia sumaria. Reiteró que, según el artículo 41 de la Ley Núm. 104-1958, quien único puede considerarse como adquirente involuntario es el acreedor hipotecario, y que PRCI no lo era.[3] Así, distinguió que la Ley Núm. 104-1958 no menciona las cesiones, sustituciones en pleitos de ejecución de hipoteca, venta de carteras de pagarés u otros instrumentos, ni de entidades que adquieren préstamos hipotecarios en función de su negocio como inversionistas y especuladores.[4] Por ende, para efectos del pago de las cuotas de mantenimiento, PRCI era un adquirente voluntario conforme a lo que se pautó en Condominio First Federal Savings v. LSREF2 Island Holdings, 202 DPR 934 (2019). Ante ello, alegó que PRCI está obligado a pagar, no solo las cuotas de mantenimiento desde que adquirió la propiedad, sino también la deuda que subsistía previo a los seis (6) meses de adquisición. La cantidad total adeudada se estimó en $110,015.69.

Por su parte, el 20 de agosto de 2019 PRCI se opuso a la solicitud de sentencia sumaria y, a su vez, solicitó que

---

[3] *Solicitud de Sentencia Sumaria*, Apéndice, pág. 224.
[4] Íd.

se dictara sentencia sumaria a su favor. Sostuvo que, de acuerdo con el Reglamento del Condominio, estaba obligada a sufragar las cuotas que se acumularan a partir de que advino titular de la propiedad únicamente.[5] Adujo que era irrelevante su condición de adquirente voluntario o involuntario dado que el Reglamento del Condominio exime del pago de cuotas atrasadas a quien adquiere como resultado de la ejecución de un crédito hipotecario.

El 9 de septiembre de 2019 el Consejo de Titulares replicó. Reiteró que únicamente recibirá tratamiento como adquirente involuntario el acreedor hipotecario y no aquel que es sustituto en pleitos de ejecución de hipoteca o comprador de una cartera de pagarés. Además, insistió en que, de conformidad con lo resuelto en Condominio First Federal Savings v. LSREF2 Island Holdings, supra, PRCI no cualificaba como adquirente involuntario y, por tanto, debía pagar la totalidad de la deuda acumulada.

En respuesta al argumento sobre el Reglamento del Condominio, el Consejo de Titulares sostuvo que ello no tiene consecuencia alguna ante la supremacía de la Ley Núm. 104-1958. Así pues, citando a Condominio First Federal Savings v. LSREF2 Island Holdings, supra, y Consejo Tit. v. Galerías Ponceñas, Inc., 145 DPR 315, 338 (1998), argumentó que la Ley Núm. 104-1958 prevalece sobre cualquier

---

[5] PRCI advino titular de la oficina 504 mediante el otorgamiento de la escritura de venta judicial el 9 de diciembre de 2017 ante la Notario Público Ana J. Bobonis Zequeira.

disposición establecida en la escritura matriz o en el reglamento.

Evaluadas las posturas de ambas partes, el 28 de octubre de 2019 el foro primario declaró con lugar la solicitud de sentencia sumaria que presentó el Consejo de Titulares. En esta, declaró con lugar la demanda de cobro y, en consecuencia, le ordenó a PRCI a pagar la cantidad de $110,015.69 más el interés legal. Razonó que, según se dispuso en Condominio First Federal Savings v. LSREF2 Island Holdings, supra, PRCI era un adquirente voluntario debido a que se dedica a la compra de carteras de préstamos para su cobro. Por otro lado, concluyó que la disposición del Reglamento del Condominio que exime del pago de cuotas atrasadas a quien adquiere en ejecución de un crédito hipotecario voluntariamente era nula por ser contraria a las disposiciones de la Ley Núm. 104-1958. En esencia, destacó que el hecho de que el Reglamento del Condominio incluyera ese articulado no era óbice para que el Consejo de Titulares reclamase el pago exigido por la Ley Núm. 104-1958. En todo caso, puntualizó que:

> Las disposiciones de la ley a estos efectos ya estaban vigentes cuando en el año 2003 se otorgó la [E]scritura [M]atriz y el mencionado [R]eglamento del [C]ondominio. Es menester señalar que la ley solo diferencia entre adquiriente voluntario e involuntario, pero sí exige el pago de las cuotas de mantenimiento, ya que sin la aportación proporcional a las expensas del inmueble, el régimen no puede sobrevivir y se derrotaría la política pública al respecto.[6]

---

[6] Sentencia del Tribunal de Primera Instancia, pág. 21. Véase, Apéndice, pág. 397.

Inconforme con el resultado, el 27 de noviembre de 2019 PRCI recurrió al Tribunal de Apelaciones. En síntesis, alegó que el foro primario erró: (1) al declarar ha lugar la solicitud de sentencia sumaria del Consejo de Titulares cuando la misma incumple con las exigencias de la Regla 36 de Procedimiento Civil, 32 LPRA Ap. V, R.36, y (2) al dictar sentencia obviando el alcance del reglamento otorgado por el Consejo de Titulares e inscrito en el Registro de la Propiedad.

El 25 de marzo de 2021 el foro intermedio notificó una Sentencia mediante la cual concluyó que "[e]s válida una disposición de la escritura matriz de un condominio, mediante la cual se exime, del pago de las cuotas de mantenimiento atrasadas, a quien adquiere una de sus unidades en ejecución de una garantía hipotecaria".[7] Ello, debido a que "[n]i la ley anterior, ni la Nueva Ley [de Condominios], prohíbe que, por la vía contractual, se acuerde que adquirentes involuntarios no responderán por parte alguna de las cuotas de mantenimiento adeudadas al momento de la adquisición".[8]

Así, resolvió que, aun si se determinase que PRCI era un adquirente voluntario, el efecto sería el mismo toda vez que la ley no impide que el Condominio exonere al adquirente voluntario del pago de las cuotas adeudadas. Por último,

---

[7] Sentencia del Tribunal de Apelaciones, pág. 1. Véase, Apéndice, pág. 466.
[8] Sentencia del Tribunal de Apelaciones, pág. 8. Véase, Apéndice, pág. 473.

destacó que cuando PRCI se convirtió en adquirente voluntario de la oficina 504 este descansó en las constancias de que se le iba a exonerar de las cuotas adeudados. Ello, debido a que tal exoneración constaba en el Reglamento del Condominio el cual estaba inscrito en el Registro de la Propiedad, y se le imputa la publicidad de su contenido.

Inconformes con la decisión del foro intermedio, el Consejo de Titulares presentó el 5 de abril de 2021 el recurso que nos ocupa. Insiste en que PRCI es un adquirente voluntario en virtud de las disposiciones tanto de la antigua Ley de Condominios como de la vigente. Por lo tanto, sostiene que está obligada al pago total de la deuda por las cuotas de mantenimiento. En específico, arguyó que la determinación del foro intermedio es errada toda vez que le confirió al reglamento de un condominio mayor jerarquía como fuente de derecho que a la ley especial de condominios.[9] Así, argumentó que la controversia de este caso era sobre la jerarquía de fuentes de derecho y que se debía resolver a su favor. Por último, destacó que el Reglamento del Condominio, aquí en disputa, respeta la jerarquía de fuentes al establecer que una ley podía controvertir o entrar en conflicto con sus disposiciones.[10]

---

[9] *Certiorari*, pág. 14.

[10] En específico, sostuvo que el artículo 17 del Reglamento del Condominio dejaba claro que:

> "---Las sumas adeudadas por gastos de mantenimiento o cualquier otra suma adeudada en virtud de decisiones o acuerdos v[á]lidos logrados por el Consejo de Titulares constituirá, **salvo que por Ley se disponga de otro modo**, un gravamen preferente sobre toda otra deuda de la unidad salvo por las contribuciones sobre la propiedad y por la primera

El 25 de junio de 2021 expedimos el auto de *certiorari* concedimos un término para que las partes presentaran sus alegatos. El Consejo de Titulares presentó el suyo y, en resumen, reiteró los mismos argumentos que en su petición de *certiorari*.

PRCI por su parte se amparó en las disposiciones de la Ley Núm. 129-2020 para sostener que el adquiriente involuntario es el acreedor hipotecario que se adjudica la propiedad mediante proceso de ejecución de hipoteca, sin distinción a si dicho acreedor hipotecario originó el préstamo hipotecario o lo adquirió posteriormente.[11] Sobre el artículo 17 del Reglamento del Condominio, PRCI sostuvo que lo allí establecido no es contrario a la ley, la moral o el orden público. Por ende, el Consejo de Titulares quedaba obligado por su escritura matriz y reglamento.[12]

Con el beneficio de la comparecencia de ambas partes, procedemos a discutir el derecho aplicable.

## II

### A. *Jerarquía de fuentes de derecho*

El concepto de jerarquía de fuentes del derecho supone que unas normas legales tienen mayor peso o valor jurídico que otras. La jerarquía es particularmente importante cuando

---

hipoteca constituida al adquirirse la misma y siempre que dicha hipoteca haya sido registrada o presentada para registro con anterioridad al surgimiento y anotación registral de dicha deuda.------------------------------- (énfasis y subrayado suplido).

[11] Alegato del Apelado, pág. 15
[12] Íd, pág. 8.

se intenta resolver una controversia que puede tener distintas soluciones dependiendo de la norma legal que aplique. En nuestra jurisdicción, la jerarquía de fuentes del derecho se ordena de la manera siguiente: (1) la Constitución del Estado Libre Asociado de Puerto Rico, como ley suprema; (2) las leyes aprobadas por la Asamblea Legislativa; (3) las reglas y los reglamentos aprobados y promulgados bajo autoridad de ley por los organismos públicos, y (4) las ordenanzas municipales. Véase, Noriega v. Gobernador, 122 DPR 650, 680 (1988); Collazo Cartagena v. Hernández Colón, 103 DPR 870, 874 (1975). Véase además, L. Muñiz Argüelles y M. Fraticelli Torres, *La investigación jurídica en el derecho puertorriqueño: fuentes puertorriqueñas, norteamericanas y españolas*, 4ta ed., Bogotá, Ed. Temis, 2006, págs. 22-24.

Al ser la Constitución de Puerto Rico la ley suprema, es esta el eje central de todas nuestras normas jurídicas. Seguido de la Constitución están las leyes, tanto especiales como generales, y las distintas resoluciones legislativas. Muñiz Argüelles, *op. cit.*, págs. 280-281.

Las fuentes de derecho que rigen los edificios sujetos al régimen de propiedad horizontal son, entre otras, la Ley de Condominios, anteriormente Ley de Propiedad Horizontal; la escritura matriz y sus anejos —según inscritos en el Registro de la Propiedad—; y el reglamento del condominio. Al respecto, hemos enfatizado que **las fuentes del derecho del régimen de propiedad horizontal no tienen la misma**

**jerarquía entre sí.** Consejo Tit. v. Galerías Ponceñas, Inc., supra, pág. 338. **Entre ellas, la Ley de Condominios tiene primacía, "por lo que cualquier disposición claramente contraria a sus disposiciones que contenga la escritura matriz o el Reglamento de Administración sería nula".** Íd. Véase, además, Brown III v. J.D. Cond. Playa Grande, 154 DPR 225, 238-239 (2001). Asimismo, hemos resuelto que las disposiciones de la Ley de Condominios son mandatorias y no supletorias. Condominio First Federal Savings v. LSREF2 Island Holdings, supra, pág. 940.

### B. Ley de Condominios

La Ley de Propiedad Horizontal, Ley Núm. 104 de 25 de junio de 1958, según enmendada, (Ley Núm. 104-1958) gobernaba el régimen de propiedad horizontal. No obstante, esta fue derogada por la Ley Núm. 129 de 16 de agosto de 2020, conocida como Ley de Condominios de Puerto Rico (Ley Núm. 129-2020).

La Ley Núm. 129-2020 entró en vigor de manera inmediata y estableció que "sus disposiciones regir[ía]n a todo inmueble sometido al régimen de Propiedad Horizontal, **irrespectivo de la fecha en que fuera sometido a dicho régimen".** (énfasis suplido). Art. 76 de la Ley Núm. 129-2020 (2020 (Parte 2) Leyes de Puerto Rico 3210).

En su Exposición de Motivos se destacó la importancia de atemperar los cambios experimentados por la sociedad puertorriqueña a un nuevo cuerpo legal que rija los asuntos relacionados al régimen de propiedad horizontal. Exposición

de Motivos de la Ley Núm. 129-2020. Asimismo, se enfatizó que la jurisprudencia de este Tribunal "ha sido fuente importante, ofreciendo su interpretación a distintas y variadas controversias que han surgido a través de los años con relación a [la] Ley [de Condominios]". Íd.

Tanto el cuerpo de normas vigentes que rigen el régimen de propiedad horizontal, como las disposiciones anteriores y su jurisprudencia interpretativa, han sido consistentes con el propósito que se pretende lograr con este tipo de vivienda. El régimen de propiedad horizontal cumple con una finalidad doble. A saber: (1) proveer a las personas la posibilidad de disfrutar el derecho a la propiedad plena e individual de un inmueble, y (2) maximizar el uso escaso de terreno disponible en el país. Park Tower, S.E. v. Registradora, 194 DPR 244, 253 (2015). De esta forma, la propiedad plena e individual coexiste con otros dueños mientras comparten áreas comunes para el disfrute de todas y todos sus integrantes. Íd.

El pago de cuotas de mantenimiento constituye un elemento fundamental para el sostenimiento de la vida en comunidad y para lograr el disfrute pleno y la coexistencia. Condominio First Federal Savings v. LSREF2 Island Holdings, supra, pág. 940. Su aportación contribuye al bienestar del condominio y a la sana convivencia entre los y las titulares. Maldonado v. Consejo de Titulares, 111 DPR 427, 430 (1981). Y es que, "[s]in la aportación proporcional a las expensas del inmueble, el régimen no puede sobrevivir y se derrotaría

la política pública al respecto". Íd. Tal es su importancia que la propia Ley de Condominios viabiliza mecanismos sumarios para facilitar el cobro por concepto de cuotas adeudadas. M.J. Godreau, *El condominio: el régimen de propiedad horizontal en Puerto Rico*, 2da ed., San Juan, Ed. Situm, 2019, pág. 299. La naturaleza sumaria de estos mecanismos está respaldada por la importancia del mantenimiento del régimen. Íd. Entre ellas: (1) la preferencia del crédito a favor de Consejo de Titulares; (2) la creación de un gravamen sobre el apartamento, y (3) la responsabilidad solidaria de aquel adquirente voluntario.

Sobre este último mecanismo, el artículo 60 de la Ley Núm. 129-2020, equivalente al artículo 41 de la Ley Núm. 104-1958, establece que un adquirente voluntario de un apartamento sometido al régimen de propiedad horizontal será solidariamente responsable con el transmitente del pago de las sumas que este adeude. Art. 60 de la Ley Núm. 129-2020, 31 LPRA sec. 1923e. Por otra parte, un adquirente involuntario será responsable solamente de las deudas por gastos comunes surgidas y no satisfechas durante los seis (6) meses anteriores al momento de adquirir la propiedad. Íd.[13]

---

[13] El artículo 60 de la Ley Núm. 129-2020 dispone que:

La obligación del titular de un apartamento por su parte proporcional de los gastos comunes constituirá un gravamen sobre dicho apartamento. Por lo tanto, luego de la primera venta, el adquirente voluntario de un apartamento será solidariamente responsable con el transmitente del pago de las sumas que éste adeude, a tenor con el Artículo 59, hasta el momento de la transmisión, sin perjuicio del derecho del adquirente a repetir contra el otro otorgante, por las

**C. Adquirente voluntario e involuntario**

En Asoc. Condómines v. Naveira, 106 DPR 88, 91 (1977) este Tribunal suplió las definiciones de quién podía identificarse como un adquirente involuntario y voluntario de un apartamento sometido al régimen de propiedad horizontal, para propósitos de la cantidad de cuota de mantenimiento a cobrarse. Allí, indicamos que el adquiriente involuntario de una propiedad era un acreedor cuyo interés fundamental no era hacerse dueño de una propiedad, sino proteger una acreencia ya constituida. En específico, enfatizamos que:

> El [adquirente] voluntario es un comprador que bien informado de los gravámenes y cargas del apartamento lo adquiere porque es un buen negocio. El adquirente involuntario es originalmente un acreedor cuyo interés fundamental no es hacerse dueño del apartamento sino proteger su acreencia constituida usualmente antes de que empiece a acumularse la deuda por gastos comunes del condominio. Asoc. Condómines v. Naveira, supra, pág. 97.

Cónsono con esa visión, posteriormente en Condominio First Federal Savings v. LSREF2 Island Holdings, supra, evaluamos si una entidad cuyo negocio es la compra de

---

cantidades que hubiese pagado como deudor solidario. Un adquirente involuntario será responsable solamente de las deudas por gastos comunes surgidas y no satisfechas durante los seis (6) meses anteriores al momento de adquirir la propiedad excepto las partidas correspondientes a penalidades por atrasos o mora, derramas, intereses y sanciones atribuibles al titular, incluirá el balance corriente que se acumule desde la adquisición de dicho inmueble por parte del adquirente involuntario.

31 LPRA sec. 1923e.

créditos hipotecarios se debía considerar un adquirente involuntario para fines de la protección del artículo 60 de la Ley Núm. 129-2020, supra. Expresamos que:

> [n]o podemos avalar que la sola compra de un crédito hipotecario (indistintamente del momento en que se adquiera) o la mera adjudicación accidental de una propiedad en pública subasta le extienda la facultad de invocar la protección del adquirente involuntario a una compañía que adquirió por "un acto volitivo dictado por su propia conveniencia en el campo de los negocios […]". Condominio First Federal Savings v. LSREF2 Island Holdings, supra, pág. 947. (citando a Asoc. de Condómines v. Naveira, supra, pág. 94.).

Lo primordial para distinguir a un adquirente voluntario de uno involuntario yace en el interés por el cual se adquiere la propiedad. El profesor Michel J. Godreau señala que "lo definitorio al clasificar al acreedor ejecutante como adquirente involuntario radica en si el acreedor hipotecario realiza un negocio lucrativo con la adquisición de la propiedad, o si con dicha adquisición lo único que logra es proteger su acreencia". Godreau, *op. cit.*, pág. 311. Asimismo, se advierte y aclara que la búsqueda de ese interés "no radica, principalmente, en el momento de la adquisición del crédito hipotecario o del inmueble, sino en la razón para adquirir o el interés fundamental por la cual se convierte en titular". Condominio First Federal Savings v. LSREF2 Island Holdings, supra, pág. 944.

Anteriormente hemos expresado que un adquirente voluntario: (1) puede ser un comprador, un donatario, un permutante o aquel que se lleva la buena pro en una subasta

pública; (2) quien adquiere el crédito hipotecario o el apartamento con el ánimo de hacer un buen negocio; (3) quien tiene la oportunidad y los medios de enterarse de la deuda por gastos comunes del condominio, y (4) quien tiene el poder de decisión para asumirlos como gravamen del inmueble que adquiere. Véase, Condominio First Federal Savings v. LSREF2 Island Holdings, supra, págs. 944-945; Asoc. de Condómines v. Naveira, supra, pág. 97.

Por otro lado, hemos señalado que un adquirente involuntario tiene los elementos siguientes: (1) es un acreedor hipotecario; (2) la razón o el interés fundamental no es convertirse en dueño del inmueble, sino proteger su acreencia constituida —usualmente— antes de que empiece a acumularse la deuda de las cuotas por mantenimiento; (3) para este, la deuda no es elemento u objeto de contratación, y (4) su acreencia no debe sufrir disminución porque el deudor incumpla otra obligación ajena y extraña a la suya. Condominio First Federal Savings v. LSREF2 Island Holdings, supra, págs. 945-946; Asoc. de Condómines v. Naveira, supra, pág. 97.

La Ley Núm. 129-2020, también nos guía en cuanto a las definiciones de adquirente voluntario e involuntario. El artículo 3(b) de la Ley Núm. 129-2020 define al adquirente involuntario como:

> El acreedor hipotecario que, para proteger su acreencia, adquiera una propiedad como parte de un proceso de ejecución de hipoteca, licitando

o sin licitar, o de dación en pago, total o parcial. 31 LPRA sec. 1921(b).

Por otro lado, define al adquirente voluntario como:

Persona que, luego de ejercer su criterio en el curso usual de los negocios, deliberadamente adquiere el bien inmueble porque le resulta un buen negocio. Se entiende que incluye a un comprador convencional, un donatario, un heredero, un legatario, un permutante o un licitador que se lleva la buena pro en la subasta. 31 LPRA sec. 1921(b).

**III**

En el presente caso nos corresponde evaluar, en primer lugar, si PRCI es un adquirente voluntario o involuntario, para fines de precisar su responsabilidad en cuanto al pago de la cuota de mantenimiento adeudada. De concluir que PRCI tiene carácter de adquirente voluntario, entonces debemos determinar si le aplica la disposición reglamentaria del Condominio que exime del pago de las cuotas de mantenimiento atrasadas a quien adquiere en ejecución de un crédito hipotecario voluntariamente.

El Consejo de Titulares sostiene que PRCI es un adquirente voluntario en virtud de las disposiciones tanto de la antigua Ley de Condominios como de la vigente. Por lo tanto, argumenta que está obligada al pago total de la deuda por las cuotas de mantenimiento. En cuanto a la disposición reglamentaria que exime del pago a los adquirentes voluntarios, el Consejo de Titulares esgrimió que el Reglamento del Condominio reconoce la supremacía de una ley sobre sus propias disposiciones. Ante ello, señaló que,

debido a que Condominio First Federal Savings v. LSREF2 Island Holdings, supra, dejaba clara la normativa sobre el cobro de cuotas a los adquirentes involuntarios y voluntarios, se debía resolver a su favor.

Por su parte, PRCI sostiene que, según la Ley Núm. 129-2020 se le debe considerar como un adquirente involuntario debido a que se le adjudicó la propiedad mediante el proceso de ejecución de hipoteca. Puntualizó que la definición en la Ley Núm. 129-2020 no distingue entre si el acreedor hipotecario originó el préstamo hipotecario o si lo adquirió posteriormente. De igual manera, insiste en que confió en las disposiciones del Reglamento del Condominio —debidamente inscrito en el Registro de la Propiedad— en cuanto a que no estaba obligado a pagar los cargos adeudados por concepto de mantenimiento anteriores a su adquisición.

Para distinguir entre un adquirente voluntario e involuntario debemos auscultar el interés o la razón por la cual se adquiere el inmueble. Entiéndase, "lo definitorio al clasificar al acreedor ejecutante como adquirente involuntario radica en si el acreedor hipotecario realiza un negocio lucrativo con la adquisición de la propiedad, o si con dicha adquisición lo único que logra es proteger su acreencia". Godreau, op. cit. pág. 311.

El adquirente voluntario es aquella persona que luego de ejercer su criterio en el curso usual de los negocios, deliberadamente adquiere el bien inmueble porque le resulta un buen negocio. Según se desprende del expediente, Doral

Financial Corporation h/n/c H.F. Mortgage Bankers presentó una demanda de cobro de dinero contra Quantum Business Engineering, Inc., DCD2012-1951, mediante la cual solicitó la ejecución de la hipoteca que gravaba la oficina 504, por haberse incumplido la obligación de pago recogida en el pagaré. Luego de varios trámites procesales, el foro primario dictó una sentencia el 27 de junio de 2014 a favor de la parte demandante. En algún momento durante el trámite postsentencia, Doral Financial Corporation h/n/c H.F. Mortgage Bankers realizó un negocio con PRCI, mediante el cual le cedió su crédito sobre la oficina 504. Así, el 6 de febrero de 2017 se produjo la sustitución de la demandante en el pleito DCD2012-1951, donde PRCI figuró como el nuevo demandante. El 23 de febrero de 2017 el foro primario dictó una orden para vender el inmueble en subasta pública. La oficina 504 se vendió en subasta pública en el pleito de ejecución de hipoteca, DCD2012-1951. PRCI se llevó la buena pro y se convirtió en el acreedor hipotecario.

De los hechos anteriores podemos colegir que el acreedor hipotecario en este caso era Doral Financial Corporation h/n/c H.F. Mortgage Bankers. Fue esta entidad quien le otorgó a los dueños anteriores de la oficina 504 el préstamo hipotecario. PRCI sustituyó a este deudor hipotecario porque adquirió el crédito como parte de un negocio. Particularmente, la compra de carteras de préstamos. Ante lo expuesto, es forzoso concluir que la cesión de PRCI fue el resultado de su criterio en el curso usual de sus negocios.

Es decir, este no adquirió la oficina 504 en protección de su acreencia pues no fue quien otorgó el préstamo hipotecario con los deudores, sino que lo hizo como parte de una transacción comercial.

Así, PRCI es un comprador que se llevó la buena pro en una subasta pública porque adquirió el crédito hipotecario de la oficina 504 con el ánimo de hacer un buen negocio. Este además tuvo la oportunidad y los medios de enterarse de la deuda por gastos comunes del condominio y de decidir si asumirlos como gravamen del inmueble que adquirió. Condominio First Federal Savings v. LSREF2 Island Holdings, supra, págs. 944-45; Asoc. de Condómines v. Naveira, supra, pág. 97. Por lo tanto, no cabe duda de que PRCI es un adquirente voluntario sujeto a la imposición de responsabilidad solidaria con relación a la deuda por cuotas de mantenimiento de la oficina 504.

Ahora bien, debemos determinar si a PRCI le cobija el artículo 17 del Reglamento del Condominio el cual exime del pago de las cuotas de mantenimiento a todo titular que adquiera su título como resultado de la ejecución de un crédito hipotecario. Es decir, si PRCI —aun siendo un adquirente voluntario— está exento de pagar las cuotas atrasadas por adquirir la propiedad en un proceso de ejecución de hipoteca. Contestamos en la negativa. La disposición reglamentaria en controversia es nula por contravenir la Ley Núm. 129-2020.

La Ley Núm. 129-2020 es actualmente el cuerpo rector del régimen de propiedad horizontal en nuestra jurisdicción. Según explicamos en Consejo Tit. v. Galerías Ponceñas, Inc., supra, este estatuto tiene supremacía en la materia sobre cualquier otra fuente de derecho que pueda coexistir con esta. En consecuencia, una disposición reglamentaria que contravenga la Ley Núm. 129-2020 es nula.

Tanto la Ley Núm. 104-1958 como la Ley Núm. 129-2020, consideran el pago de las cuotas de mantenimientos como un asunto de política pública de la vida en comunidad. Esto, pues, garantizan el buen funcionamiento del régimen y sin la aportación proporcional de sus titulares, el régimen no puede sobrevivir. Asociación de Condómines v. Los Frailes, SE, 154 DPR 800, 815 (2001).[14]

Con esta política pública en mente, la Asamblea Legislativa dispuso que "el adquirente voluntario de un apartamento será solidariamente responsable con el transmitente del pago de las sumas que éste adeude". Art. 60 de la Ley Núm. 129-2020, 31 LPRA sec. 1923e. En otras palabras, los adquirentes convencionales vendrán obligados al pago total de las cuotas adeudadas. A modo de excepción,

---

[14] Para propósito de la controversia ante nos, es menester señalar que PRCI advino titular de la oficina 504 en el 2017. Entiéndase, antes de la aprobación de la Ley Núm. 129-2020. No obstante, por mandato expreso, la Ley Núm. 129-2020 aplicará a esta controversia. Nótese que, independientemente del momento de adquisición del inmueble, la interpretación de esta controversia es la misma tanto bajo la ley de condominios anterior como en virtud de la nueva ley. Ello, puesto a que el objetivo del régimen de propiedad horizontal ha sido el mismo bajo la ley anterior como en la vigente. Por ello, la interpretación que hicimos en Condominio First Federal Savings, supra, bajo la ley anterior es extrapolable al análisis que se realice al amparo de la ley vigente, debido a que su finalidad sigue siendo la misma.

el estatuto reconoce que los adquirentes involuntarios serán responsables solamente de las deudas por gastos comunes surgidas y no satisfechas durante los seis (6) meses anteriores al momento de adquirir la propiedad. Estos, según definidos por la ley, son "los acreedor[es] hipotecario[s] que, para proteger su acreencia, adquiere[n] una propiedad como parte de una proceso de ejecución de hipoteca". Art. 3 de la Ley Núm. 129-2020, 31 LPRA sec. 1921b.

En consecuencia, el Reglamento del Condominio no puede eximir del pago de las cuotas a ningún adquirente puesto que, tanto la antigua Ley de Condominio como la vigente, establecen que el adquirente voluntario y el involuntario están obligados a pagar toda la deuda o parte de esta, respectivamente.

Ante ello, PRCI no puede ampararse en una disposición que es contraria a la Ley Núm. 129-2020 y contra el propósito de la existencia del régimen de propiedad horizontal. Y es que, como vimos, la obligación del pago de las cuotas de mantenimiento es una de carácter especial. Godreau, *op. cit.* pág. 299.

Así, conforme a la Ley Núm. 129-2020 y la política pública detrás de la imposición del pago de la cuota, el Condominio no puede contravenir el mandato expreso del artículo 60 de la Ley Núm. 129-2020, equivalente al antiguo artículo 41 de la Ley Núm. 104-1958, sobre que "el adquirente voluntario de un apartamento **será solidariamente responsable con el transmitente del pago de las sumas que éste adeude"**.

Art. 60 de la Ley Núm. 129-2020, 31 LPRA sec. 1923e (énfasis suplido).

Siguiendo la jerarquía de las fuentes de derecho aplicables al régimen de propiedad horizontal, no nos queda más que resolver que lo dispuesto en el artículo 17 del Reglamento del Condominio, es nulo. Además, recordemos que las disposiciones de la Ley Núm. 129-2020 son mandatorias y no supletorias. Condominio First Federal Savings v. LSREF2 Island Holdings, supra, pág. 940. Por ende, PRCI no podía relevarse de su obligación de pago de cuotas de mantenimiento so pretexto de que se le eximía por reglamento.

Finalmente, enfatizamos que no podemos obviar la política pública que dio origen al régimen de propiedad horizontal. Una interpretación contraria a la pautada en Condominio First Federal Savings v. LSREF2 Island Holdings, supra, "daría al traste con el principio valorativo que ha permeado todo el régimen de propiedad horizontal en Puerto Rico." Godreau, op. cit., pág. 310. Además, si se toma en consideración que la legislatura utilizó como base nuestra jurisprudencia para atemperar la Ley Núm. 129-2020 a las nuevas realidades y retos que trae el régimen de propiedad horizontal, no vemos por qué la legislatura rechazaría e ignoraría las determinaciones de este foro en un tema tan puntual como este. De igual manera, en la exposición de motivos de la Ley Núm. 129-2020, la legislatura no rechazó de forma expresa lo resuelto por este Tribunal en Condominio First Federal Savings v. LSREF2 Island Holdings, supra.

CC-2021-0300                                                    24

A tono con lo expuesto, reiteramos que la interpretación de quién es adquirente involuntario no consiste en el momento de la adquisición del crédito hipotecario o del inmueble sino, más bien, en el análisis de si el crédito hipotecario del bien adquirido es para proteger su crédito o si es consecuencia de un **negocio lucrativo**. Véase, Condominio First Federal Savings v. LSREF2 Island Holdings, supra; Godreau, *op. cit.,* pág. 313. Asimismo, establecemos que cualquier disposición reglamentaria que exima del pago de las cuotas de mantenimiento a quien adquiere como resultado de la ejecución de un crédito hipotecario, es contraria a la política pública del pago de las cuotas de mantenimiento y a las disposiciones de la Ley Núm. 129-2020. En consecuencia, PRCI está sujeto al pago de la deuda por cuotas de mantenimiento de la oficina 504.

**IV**

Por los fundamentos antes expuestos, se revoca la Sentencia del Tribunal de Apelaciones y se reinstala el dictamen del Tribunal de Primera Instancia.

Se dictará sentencia de conformidad.


                                        Maite D. Oronoz Rodríguez
                                             Jueza Presidenta

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Consejo de Titulares del Condominio Centro Internacional de Mercadeo Torre II representado por su Junta de Directores

    Peticionario

       v.

PRCI LOAN CR, LLC

    Recurrido

CC-2021-0300

SENTENCIA

En San Juan, Puerto Rico, a 15 de agosto de 2022.

Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte de la presente Sentencia, se revoca la Sentencia del Tribunal de Apelaciones y se reinstala el dictamen del Tribunal de Primera Instancia.

Lo acordó el Tribunal y certifica el Secretario del Tribunal Supremo. El Juez Asociado señor Kolthoff Caraballo disiente y emite la expresión siguiente a la que se une la Jueza Asociada señora Pabón Charneco.

"El Juez Asociado señor Kolthoff Caraballo disiente de la Opinión del Tribunal por entender que el análisis y la determinación del Tribunal de Apelaciones, ante los hechos tan particulares de este caso, fue básicamente correcta".

Javier O. Sepúlveda Rodríguez
Secretario de Tribunal Supremo